Defendants and against Plaintiffs in the instant cause of action.

SUN MICROSYSTEMS, INC., a Delaware
Corporation, Plaintiff,

v.

MICROSOFT CORPORATION, a
Washington Corporation,
Defendant.

No. C 97–20884 RMW(PVT).

United States District Court,
N.D. California.

March 24, 1998.

Lloyd R. Day, Jr., Cooley Godward LLP, Palo Alto, CA, for Plaintiff.

David T. McDonald, McDonald & Quackenbush, Seattle, WA, Terrence P. McMahon, Orrick, Herrington, & Sutcliffe LLP, Menlo Park, CA, Allen Ruby, Ruby & Schofield, San Jose, CA, for Defendant.

### ORDER RE SUN'S MOTION FOR PRELIMINARY INJUNCTION AGAINST MICROSOFT

WHYTE, District Judge.

The motion of plaintiff Sun Microsystems, Inc. for a preliminary injunction was heard on February 27, 1998. The court has read the moving and responding papers and heard the oral argument of counsel.[1] For the reasons set forth below, the court grants Sun's motion for a preliminary injunction.

## I. BACKGROUND

Plaintiff Sun Microsystems, Inc. ("Sun") brings this action against defendant Microsoft Corporation ("Microsoft"), alleging that Microsoft breached the Technology License and Distribution Agreement ("TLDA") pursuant to which Microsoft licensed Sun's JAVA™ Technology. Sun also contends that Microsoft has violated the trademark license provisions of the TLDA which grant Microsoft the right to use Sun's "JAVA Compatible" trademark provided that Microsoft's products pass certain compatibility tests. Sun alleges that Microsoft is infringing Sun's "JAVA Compatible" trademark by distribut-ing products bearing the trademark that do not satisfy the TLDA requirements. Sun now seeks to preliminarily enjoin Microsoft from using the "JAVA Compatible" trademark on Microsoft's Internet Explorer 4.0 ("IE 4.0") and Software Developer's Kit for Java 2.0 ("SDKJ 2.0") until and unless each such product first passes the Sun test suite accompanying the most current version of the JAVA™ Technology incorporated in such product.

### A. SUN'S JAVA[tm] TECHNOLOGY AND LICENSING PROGRAM

Sun's JAVA™ Technology comprises a standardized application programming environment that affords software developers the ability to create and distribute a single version of programming code which is capable of operating on many different, otherwise incompatible, system platforms and browsers. Most computer systems implement platform-dependent programming environments, such as Microsoft's Win32 programming environment. Programs created to run on a particular platform will not function on a different platform. Thus, a software developer must choose the platforms for which it will develop and support different versions of the same program. Sun's platform-independent JAVA™ Technology, which can be implemented on many different system platforms and browsers, obviates the need for creating and supporting different versions of the same program.

Sun's JAVA™ Technology is a so-called "class-based" language in that its functionality is determined by the Java classes available to the programmer. Therefore, new functionality requires developing new Java classes. Programs written in the Java programming language are compiled into intermediate instructions called bytecodes or Applets. *See* TLDA § 1.2. These bytecodes or Applets are then "interpreted" by another computer program which emulates a hypothetical CPU called the Java Virtual Machine. *See* TLDA § 1.11. The Java Virtual Machine translates the Applets into instruc-

---

**1.** The court has not considered any papers other than those in connection with the motion, opposition, and reply. The court does not find that a sufficient showing has been made to justify the court's consideration of the papers filed by either party after Sun's reply brief.

tions understood by the specific computer CPU on which the Java Virtual Machine is running. Therefore, a specific interpreter or virtual machine is needed for each computer CPU on which the Java program is run.

In an effort to promote widespread adoption of the JAVA™ Technology, Sun embarked on an open licensing program. Beginning in August 1995, Sun entered into license and distribution agreements with major platform manufacturers, including Apple, DEC, Fujitsu, Hewlett–Packard, IBM, Microsoft, Netscape, Novell, SCO, Siemens, and Silicon Graphics.

Sun asserts that, in general, these license agreements grant Sun's source code licensees the right to develop and distribute value-added products that incorporate Sun's JAVA™ Technology. The license agreements also require the products developed by licensees to pass certain compatibility tests created by Sun, called the JCK compatibility test suite. Provided that its software product passes Sun's test suite, the licensee is also granted the right to display Sun's "JAVA Compatible" trademark on its product. Sun also asserts that in order to maintain and extend the cross-platform benefits of the JAVA™ programming environment, it is critical that each licensee's system platform or browser strictly adheres to Sun's published specifications.

In connection with Sun's licensing program, Sun has developed its JAVA™ Compatibility Kit ("JCK"). The JCK comprises an array of conformance tests to determine whether products developed by Sun's licensees conform to the specifications for JAVA™ Technology. In January 1996, Sun released its first commercial version of the JAVA™ Development Kit ("JDK") 1.0. At the same time, Sun also released the JAVA™ 1.0 compatibility test suite comprising approximately 300 individual tests. Schroer Decl. ¶ 8. In February 1997, Sun released JDK 1.1 which was an upgrade to the JAVA™ Technology. The JDK 1.1 release was accompanied by the so-called JAVA™ Compatibility Kit ("JCK") 1.1a test suite which incorporated over 8,000 individual tests. Schroer Decl. ¶ 9.

One test in the JCK 1.1a release is the so-called "Signature Test." The Signature Test is designed to ensure that products implementing the JAVA™ Technology uniformly adhere to a standard set of public application programming interfaces called the "java." APIs. Hankinson Supp. Decl. ¶ 8. More specifically, the JCK 1.1a Signature Test probes for additions, deletions, and modifications to any public element of any package or class bearing the "java." prefix. Hankinson Supp. Decl. ¶ 11. The Signature Test appears to be one of the most important tests in JCK 1.1a since adherence by licensees to a standard set of APIs is critical to maintaining cross-platform compatibility. Hankinson Supp. Decl. ¶ 8.

**B. SUN'S LICENSE AGREEMENT WITH MICROSOFT**

*1. JAVA Compatibility*

On March 11, 1996, Microsoft entered into a Technology License and Distribution Agreement with Sun. Pursuant to sections 2.1 and 2.2 of the TLDA, Sun granted Microsoft a license to develop and distribute software products which incorporate Sun's JAVA™ Technology. *See* Baratz Decl. Ex. A. Pursuant to section 2.6(a)(iv), each new version of any Microsoft product that incorporates Sun's JAVA™ Technology must pass the test suites of the JCK. The TLDA defines the "Java Test Suite" as "SUN's publicly available test suites for validating that products · which interpret Java bytecodes comply with the SUN specification of the AAPI as of the date of the test suites." TLDA § 1.15. The AAPI is defined as:

(a) the public application programming interface to the Java Applet Environment (JAE) reflected in the Technology as identified in Exhibit A, (b) the bytecode specification in the Documentation entitled "OEM Java Virtual Machine Specification," (c) the Java language specification in the Documentation entitled "OEM Java Language Specification" and (d) the OEM Java API Specification, as modified by SUN during the term of this Agreement.

TLDA § 1.1. Sun and Microsoft also entered into a trademark license agreement concurrently with the TLDA. The trademark li-

cense agreement grants Microsoft a license to use Sun's "JAVA Compatible" trademark only in connection with products which pass. Sun's relevant compatibility test suites.

### 2. *Microsoft's Rights to Determine Specific Implementations of JAVA™ Technology*

Microsoft argues that the TLDA contains significant restraints on Sun's ability to impact Microsoft's incorporation of the JAVA™ Technology into its products. First, added functionality to the JAVA™ Technology must be included in new classes called "Supplemental Java Classes." TLDA § 1.23. Microsoft is not obligated to include Supplemental Java Classes in its products; provided, however, that Microsoft makes the Supplemental Java Classes available to the public through alternative distribution channels. TLDA §§ 2.6(a)(vii), 2.7(a). The TLDA also requires that any Supplemental Java Classes must run on Microsoft's most current products incorporating the JAVA™ Technology. *See* TLDA § 2.7(a).

Second, the TLDA appears to limit Sun's modifications to existing Java classes to "reasonable enhancements which remain consistent with [their] original intended purpose." TLDA § 2.7(b). Additionally, Sun agreed that any upgrade to the JAVA™ Technology would be backward compatible with the two previous upgrades. TLDA § 2.6(a)(iii).

The TLDA also permits Microsoft to extend or make additions to the AAPI, referred to as "Value Added Open Packages" or "VAOPs." TLDA §§ 1.28, 2.8(a). However, the TLDA restricts Microsoft to a specific naming convention for any VAOPs. *See* TLDA § 2.8(d). Additionally, the TLDA proscribes any modification or addition to the names of the public java classes "whose names begin with 'java,' 'COM.sun' or their equivalents." TLDA § 2.8(d).

### 3. *Limitation of Remedies*

Microsoft also argues that the TLDA precludes the injunctive relief sought by Sun. Section 11.2(d) of the TLDA provides:

> Except as expressly stated in this Section 11.2 and in Section 12.6, the parties agree that in the event that either party breach-

es any material term of this Agreement, the non-breaching party shall deliver notice thereof to the breaching party and the breaching party shall have thirty (30) days from receiving such notice to cure such breach. If the breach continues after such 30–day period, the non-breaching party's sole remedy shall be to seek monetary damages in a court of competent jurisdiction.

Baratz Decl. Ex. A. Furthermore, section 11.2(b) provides Sun the right to terminate the licenses granted under the TLDA for a wilful and intentional breach, if Microsoft fails to cure the breach within one year of Sun's providing Microsoft notice of such breach. *Id.* Such a license termination, however, does not appear to apply to products commercially available at the time of such termination. *Id.* In addition, the TLDA expressly incorporates by reference the Trademark License between Microsoft and Sun. Baratz Decl. Ex. A, § 2.6(a)(ix). The Trademark License also provides that the TLDA shall control in the case of any inconsistency between the TLDA and the Trademark License. Baratz Decl. Ex. B.

Microsoft contrasts these provisions with the provisions in Sun's proposed license agreement sent to Microsoft on November 29, 1995. Sun's proposed license agreement, rejected by Microsoft, contained an "Irreparable Harm" clause, providing:

> [The parties] agree that, in addition to any other legal remedies to which a non-breaching party might be entitled, such party may seek immediate injunctive relief in the event of a breach of the provisions of [sections 2.0, 5.2, 5.3, 7.0, 9.2 or 11.6 of the proposed agreement].

Muglia Decl. Ex. A, § 10.7. Microsoft contends that, during the negotiations resulting in the TLDA, Microsoft specifically bargained for specific dispute resolution mechanisms and a damages and remedies limitation. Muglia Decl. ¶ 10.

Sun, on the other hand, argues that the TLDA does not preclude injunctive relief. Sun argues that section 11.2(d) of the TLDA is inapplicable. Rather, Sun contends that section 11.2(b) applies since Microsoft's senior management has wilfully contravened the

compatibility provisions of the TLDA. Section 11.2(b) provides:

> Licensee agrees that if at any time during the Term an officer, director, or General Manager of a product group of Licensee wilfully and intentionally breaches a material provision of Section 2.6 of the Agreement and Licensee fails to cure such breach within a period of one (1) year after the date that SUN provides Licensee with notice thereof, SUN shall have the right to terminate this Agreement and terminate the license grants set forth in Section 2, except with respect to any Products, including any upgrades, versions, or successors thereto, which are, as of the date of termination, either (i) commercially available to the public, or (ii) being beta tested by third parties as of the date of termination or (iii) are made commercially available to the public within six (6) months after the date of termination (collectively " Surviving Products"). Licensee's rights under Section 2 of this Agreement with respect to Surviving Products shall survive any expiration or termination of this Agreement.

Sun contends that section 11.2(b) places no limitation on Sun's remedies for Microsoft's intentional breaches of the compatibility provisions of the TLDA. Sun argues that section 11.2(b) of the TLDA was drafted after Sun's negotiators made clear that compatibility was critically important to Sun and that Sun did not wish to limit its ability to take whatever legal action was necessary if the compatibility provisions of the TLDA were wilfully violated. Day Decl. Ex. R (Baratz Depo. at 105:9–16). Sun also argues that Microsoft's construction of the TLDA effects an implicit waiver of Sun's right to injunctive relief. Sun contends that such a construction directly contradicts the law of waiver which requires the intentional relinquishment of a known right.

C. MICROSOFT'S USE OF SUN'S JAVA™ TECHNOLOGY AND "JAVA COMPATIBLE" TRADEMARK

On September 30, 1997, Microsoft began commercial distribution of its IE 4.0 web browser via the Microsoft Website. According to Microsoft, IE 4.0 incorporates and is fully compatible with the JDK 1.1 version of Sun's JAVA™ technology. Shroer Decl. Ex.

A. During the months preceding the release of IE 4.0 and continuing thereafter, Microsoft displayed Sun's "JAVA Compatible" trademark on its website in close proximity to Microsoft's IE 4.0 logo. Microsoft's packaging for its CD–ROM versions of IE 4.0 also utilized the "JAVA Compatible" trademark. Deutsch Decl. Ex. D. Similarly, Microsoft's website for its SDKJ 2.0 product displayed the "JAVA Compatible" trademark. Armstrong Decl. Ex. C.

D. SUN'S TESTING OF IE 4.0 AND SDKJ 2.0

From September 30 to October 6, 1997, Sun ran various commercial versions of Microsoft's IE 4.0 and SDKJ 2.0 through its JCK 1.1a test suite to determine whether Microsoft's implementation of the JAVA™ Technology was compatible. Sun's testing revealed that IE 4.0 and SDKJ 2.0 failed to pass the JCK 1.1a test suite. On October 7, 1997, Sun notified Microsoft that the these software products failed to pass the test suites and asked for Microsoft's commitment to bring them into compliance. Baratz Decl. Ex. C. On October 29, 1997, Microsoft responded with a letter stating that IE 4.0 and SDKJ 2.0 fully comply with the TLDA and that, therefore, it intended to continue use of the "JAVA Compatible" trademark as required by the TLDA. Baratz Decl. Ex. D.

Sun's in-house and independent testing both revealed that IE 4.0 failed to pass Sun's Signature Test. In fact, IE 4.0 generated approximately 900 Signature Test errors, 792 of which resulted from the fact that Microsoft chose not to include the JAVA Remote Method Invocation ("RMI") class. Schroer Supp. Decl. ¶ 6; Hankinson Decl. ¶ 30. However, since the RMI class is a "Supplemental Java Class," the TLDA allows Microsoft the option to exclude it from its product implementations of the JAVA™ Technology, as long as Microsoft makes the RMI class libraries publicly available. See TLDA § 2.7(a). Sun also argues that Microsoft has failed to meet its obligations under section 2.7(a) with respect to distribution of the RMI class libraries. Additionally, IE 4.0 does not include Sun's JAVA Native Interface ("JNI") and, therefore, fails to pass any of the corresponding 239 tests relating to JNI. Schroer

Supp. Decl. ¶ 7. Microsoft's SDKJ 2.0 product generated the same failures. Schroer Supp. Decl. ¶ 8.

Microsoft's response to Sun's testing appears to admit that the results are accurate. Microsoft contends, however, that when the results of Sun's testing are evaluated against the terms of the TLDA, IE 4.0 and SDKJ 2.0 actually comply with the parties' agreement and, therefore, are fully licensed products. For example, Microsoft argues that the TLDA does not obligate Microsoft to include Sun's JNI class libraries since compatibility testing is confined to the AAPI. As to the Signature Test errors which are unrelated to the exclusion of the RMI classes, Microsoft argues that these errors arise from deliberate modifications to Sun's public java classes. Microsoft argues that the TLDA permits modification of these java classes as long as the names of these java classes are not changed. *See* TLDA § 2.8(d). *See also* Armstrong Decl. Ex. A; Hankinson Supp. Decl. Ex. B (Arun Depo. at 159:3–25); Microsoft's Opposition at 16.

## II. STANDARD OF REVIEW

To obtain a preliminary injunction, a movant must demonstrate "either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1517 (9th Cir.1992) (citations omitted). The alternatives in the above standard represent "extremes of a single continuum," rather than two separate tests. *Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir.1978). A "serious question" is one to which the movant has a "fair chance of success on the merits." *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir.1984). The "balance of harm" evaluation should precede the "likelihood of success analysis" because until the balance of harm has been evaluated the court cannot know how strong and substantial the plain-

tiff's showing of the likelihood of success must be. *See Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1389. (9th Cir.1988). If a public interest is involved, the court should also consider if the grant of a preliminary injunction favors the public interest. *Westlands Water Dist. v. Natural Resources Defense Council*, 43 F.3d 457, 459 (9th Cir. 1994).

## III. ANALYSIS

### A. THE TLDA'S EFFECT ON THE AVAILABILITY OF INJUNCTIVE RELIEF

■ "[A] clear and unambiguous contractual provision providing for an exclusive remedy for breach will be enforced." *Fosson v. Palace (Waterland), Ltd.*, 78 F.3d 1448, 1455 (9th Cir.1996) (quoting *Price Dev. Co. v. Redevelopment Agency*, 852 F.2d 1123, 1127 (9th Cir.1988)).

■ In the present case, the TLDA does not appear to preclude the injunctive relief requested by Sun. As a preliminary matter, the court finds that the Trademark License and the TLDA constitute one agreement. The TLDA expressly incorporates the Trademark License by reference. Further, the Trademark License provides that the terms of the TLDA override any conflicting provision in the Trademark License.

Second, the TLDA appears to distinguish between wilful and intentional breaches of the compatibility provisions [Section 11.2(b)] and other material breaches of the TLDA [Section 11.2(d)]. Section 11.2(d) of the TLDA expressly limits the parties' remedies for any material breach to monetary damages. However, it appears that section 11.2(b), rather than section 11.2(d), applies in circumstances involving wilful and intentional breaches of the TLDA's compatibility provisions.[2]

Third, no language in section 11.2(b) precludes Sun from injunctive relief to redress infringement of its trademark. By its plain meaning, section 11.2(b) provides Sun a right

---

**2.** The clause of section 11.2(d) providing that monetary damages is the sole remedy appears to be linked to breaches to which the 30–day notice and cure period applies, rather than breaches covered by section 11.2(b). *See* TLDA § 11.2(d).

*See also Ticor Title Ins. Co. v. Rancho Santa Fe Ass'n*, 177 Cal.App.3d 726, 730, 223 Cal.Rptr. 175 (1986) (if a general and specific provision are inconsistent, the specific provision controls).

to terminate the license grants under the TLDA for a wilful and intentional breach of the compatibility provisions by Microsoft's senior management officials provided, however, that certain conditions are met. More importantly, this right of termination does not appear to be an exclusive remedy. *Cf.* TLDA § 11.2(d). Accordingly, given that 11 .2(b) applies to the instant situation and that Sun's right of termination is not Sun's exclusive remedy, the TLDA does not preclude Sun from seeking to enjoin Microsoft's use of the "JAVA Compatible" trademark on products that do not pass Sun's JCK test suite. *See McDonald v. Stockton Met. Transit Dist.,* 36 Cal.App.3d 436, 442, 111 Cal.Rptr. 637 (1973) ("When a contract describes a remedy for breach without an express or implied limitation making that remedy exclusive, the injured party may seek any other remedy provided by law.").

This interpretation appears to be consistent with the terms of the TLDA and federal trademark law. The Trademark License provides that Microsoft's license to use the "JAVA Compatible" logo only applies to products that have successfully passed the JAVA test suites contemplated by the TLDA. Baratz Decl. Ex. B (Trademark License § 3). It follows that an incompatible implementation of the JAVA™ Technology, as defined by the TLDA, is an unauthorized and unlicensed product at least as to use of Sun's "JAVA Compatible" trademark. Therefore, it would be anomalous to construe the TLDA to preclude Sun from seeking injunctive relief against Microsoft's wilful use of the "JAVA Compatible" trademark on products that are unlicensed and recognized by Microsoft not to be compatible with Sun's JAVA™ Technology. Indeed, Microsoft's interpretation of the TLDA would allow it the continued use of the "JAVA Compatible" trademark, without the slightest threat of an injunction to force compliance, on incompatible implementations ("Surviving Products") of the JAVA™ Technology even after Sun terminated the licenses granted under the agreement. *See* TLDA §§ 11.2(b), 11.5; *Ticor Title Ins. Co. v. Rancho Santa Fe Assn.,* 177 Cal.App.3d at 730, 223 Cal.Rptr. 175 (when contract is susceptible of two interpretations, the court should avoid the interpretation which results in absurdity). In addition,

the court's interpretation also appears to further the public policy of the trademark laws of protecting against consumer confusion. *See Prudential Ins. Co. of America v. Gibraltar Fin. Corp. of California,* 694 F.2d 1150, 1153 (9th Cir.1982) (Lanham Act intended to protect public against fraud and confusion); *VISA Intern. Service v. Bankcard Holders,* 784 F.2d 1472, 1473–74 (9th Cir.1986) (a party will normally be held to a settlement agreement relating to use of trademark, unless enforcement of contract would result in public injury through consumer confusion).

Microsoft argues that its interpretation of section 11 of the TLDA is supported by Microsoft's rejection of the irreparable harm provision in Sun's proposed license agreement. *See* Muglia Decl. ¶ 10 & Ex. A, § 10.7. However, Sun's proposed license agreement did not distinguish between wilful and intentional breaches specific to the compatibility provisions of the TLDA and other breaches. Thus, the inclusion of section 11.2(b) into the TLDA undermines Microsoft's argument that Sun waived its right to injunctive relief under any circumstances.

### B. BALANCE OF HARDSHIPS

■ The balance of hardships from the granting of a preliminary injunction as outlined below tilts in Sun's favor. Sun's application for a preliminary injunction only seeks to discontinue Microsoft's use of the "JAVA Compatible" trademark on products that do not meet the compatibility requirements of the TLDA. As to Microsoft's products that have already been labeled with the "JAVA Compatible" trademark, Sun requests that this court enter an order requiring Microsoft to either withdraw or recall and "sticker" non-complying products. Otherwise, Microsoft's use of Sun's JAVA™ Technology would remain unaffected by the grant of the preliminary injunction requested by Sun.

Microsoft argues that the requested relief would involve significant hardship to Microsoft. Microsoft argues that such an injunction would severely disrupt its manufacturing processes and distribution channels. The hardship alleged by Microsoft, however, does not appear to outweigh the potential irrepa-

rable harm to Sun, its licensees, and the consuming public caused by Microsoft's use of the "JAVA Compatible" trademark on non-complying products.

Microsoft also argues that Sun has unreasonably delayed and, therefore, should be barred from seeking injunctive relief. The court finds, however, the Sun did not unreasonably delay in seeking injunctive relief. Microsoft was apparently aware of the possibility of Sun's seeking injunctive relief as of Sun's October 7, 1997 letter indicating the failure of Microsoft's products to pass the Test Suites contemplated by the TLDA. The court also notes that Microsoft waited until October 29, 1997 to respond to Sun's letter. In addition, the alleged delay between Microsoft's responsive letter and Sun's application for a preliminary injunction filed on November 17, 1997 does not appear to be unreasonable.

**C. LIKELIHOOD OF SUCCESS ON THE MERITS**

■ (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). To establish a claim for trademark infringement under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a plaintiff must prove: 1) ownership of a protectable trademark; 2) unauthorized use of that trademark by the defendant; 3) that defendant's use was in connection with goods or services; 4) that the use was in interstate

commerce; and 5) a likelihood of consumer confusion. *See Metro Pub. Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640–41 (9th Cir.1993); *Summit Tech. v. High–Line Med. Instruments Co.*, 933 F.Supp. 918, 928 (C.D.Cal.1996); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:13 at 27–23 (4th ed.1997). Sun and Microsoft appear to agree that the only issues in dispute as to Sun's claim for trademark infringement under section 43(a) of the Lanham Act are: 1) whether Microsoft's use of Sun's "JAVA Compatible" trademark is authorized under the TLDA; and 2) whether there is a likelihood of consumer confusion.

### 1. *Unauthorized Use of Sun's "JAVA Compatible" Logo*

■ A determination of Microsoft's compliance with the TLDA appears to be dispositive of whether its use of Sun's "JAVA Compatible" trademark is authorized. Microsoft raises a number of issues in this regard.

#### a. "Relevant Test Suite"

Microsoft argues that under section 2.6(a)(iv) of the TLDA, Microsoft's products are not required to pass the JCK 1.1a test suite, upon which Sun appears to base its motion, since the JDK 1.1 upgrade accompanying this test suite is not backward compatible with Sun's previous versions of the JAVA™ Technology. *See* TLDA § 2.6(a)(iii); Baratz Decl. Ex. A. Microsoft contends that the test suite delivered by Sun with its JDK 1.0.2 version is the "Relevant Test Suite" under the TLDA. Microsoft also contends that on about February 21, 1997, it notified Sun that its latest version of the JAVA™ Technology did not comply with section 2.6(a)(iii) of the TLDA. *See* McMahon Decl. Ex. T. Sun contends, however, that it received no such letter. Baratz Reply Decl. ¶ 11.

Section 2.6(a)(iv) provides:

Subject to the satisfaction of Section 2.6(a)(iii), Licensee agrees that upon the earlier of (a) six (6) months after the date that SUN delivers to Licensee an Upgrade that SUN designates as a significant upgrade (each, a "Significant Upgrade"), or (b) the date that Licensee includes the

Significant Upgrade of the Java Reference Implementation in the commercial release of any Product, Licensee shall deliver to SUN, ... an upgrade to the Java Reference Implementation (each, a "Compatible Implementation") that passes the test suite that accompanied the significant upgrade (a "Relevant Test Suite").

TLDA § 2.6(a)(iv); Baratz Decl. Ex. A.

Microsoft points to eleven errors or points of incompatibility between JDK 1.0.2 (the prior version) and JDK 1.1 to argue that Sun has breached section 2.6(a)(iii). Sun argues that nine of these errors resulted from permissible incompatibilities necessarily created to fix program errors in the JDK 1.0 product. Schroer Reply Decl. ¶ 9. *See also* TLDA § 2.6(a)(iii) (excepting program fixes from backward compatibility requirement). Sun has apparently addressed the remaining two errors in subsequent upgrades of the JDK. *Id.*

Not considering timing issues, Microsoft's obligation to deliver an upgraded "Java Reference Implementation" that passes Sun's current compatibility tests arises when: (1) Sun delivers an upgrade to the JAVA™ Technology which complies with section 2.6(a)(iii) of the TLDA; and (2) Sun designates the upgrade as a "Significant Upgrade." TLDA § 2.6(a)(iv). Notably, section 2.6(a)(iv) only appears to obligate Microsoft to deliver an upgraded "Java Reference Implementation" upon certain conditions. Even assuming that Sun's JDK 1.1 release does not comply with section 2.6(a)(iii), the TLDA does not appear to allow Microsoft to incorporate that release into its software products free of all compatibility obligations.[3] *See Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 362 (7th Cir.1993) (infringement of trademark is not a proper self-help remedy for licensor's breach of license agreement). Accordingly, when faced with an upgrade that apparently did not comply with section 2.6(a)(iii) of the TLDA, Microsoft's proper course was to withhold its incorporation

into its products. This result also appears to be consistent with the TLDA since an alleged failure of Sun's upgrade to be backwards compatible appears to prevent the advance of the "Compatibility Date." *See* TLDA § 2.6(a)(vi) ("any new version of a Product ... after the most recent Compatibility Date shall only include the corresponding Compatible Implementation.").

Further, Microsoft incorporated Sun's JDK 1.1 release of the JAVA™ Technology into IE 4.0 and SDKJ 2.0 with the apparent knowledge that this upgrade did not meet the requirements of section 2.6(a)(iii). It follows that Microsoft may have waived its objections to the JCK 1.1a test suite as the Relevant Test Suite. Additionally, Microsoft's own internal documents appear to reveal that Microsoft felt that it was obligated to pass the JCK 1.1a test suite. Day Decl. Exs. L & M. Sun's engineers apparently received no objection to the incompatibilities now asserted by Microsoft. Schroer Reply Decl. ¶ 9.

b. "Passing" the JCK 1.1a Test Suite

Microsoft's opposition indicates that the determination of whether IE 4.0 and SDKJ 2.0 "pass" Sun's relevant test suite is solely an issue of contractual interpretation. Microsoft appears to admit that its IE 4.0 and SDKJ 2.0 products generate Signature Test failures. Microsoft argues, however, that when the Signature Test's reported failures are construed in light of the TLDA, Microsoft's products fully comply with the compatibility requirements of section 2. Microsoft argues that the TLDA allows Microsoft "to extend and enhance the java.* classes as long as it does not modify or extend the java.* class names." Opposition at 16. *See* TLDA § 2.8(d). Accordingly, Microsoft argues that the reported Signature Test errors are merely the results of changes to the Java classes permitted by the TLDA.

Microsoft's manipulation of the ambiguities surrounding section 2 of the TLDA, however, cannot be reconciled with the purpose behind

---

**3.** Microsoft's argument that the JCK test suite accompanying the JDK 1.0.2 release is the relevant test suite despite the incorporation of the Sun's JDK 1.1 technology is unpersuasive. This argument appears to make little sense since many of the tests in the test suites appear to be version specific. *See* Hankinson Suppl. Decl. ¶ 14; *see also* Hankinson Decl. ¶¶ 20, 22. Moreover, Microsoft's interpretation of the TLDA is inconsistent with JAVA's objective of cross-platform compatibility.

the TLDA and the JAVA™ Technology itself. Microsoft's reading of the TLDA would essentially allow Microsoft to destroy the cross-platform compatibility of the JAVA programming environment. *See* Hankinson Supp. Decl. ¶¶ 8, 11, 12. Moreover, the TLDA appears to limit any functionality added by Microsoft (VAOPs) to classes outside the public java.* class APIs. The TLDA also appears to require Microsoft to adhere to specific naming conventions for this added functionality. *See* TLDA §§ 1.28, 2.8.

Microsoft also argues that the TLDA does not require that IE 4.0 or SDKJ 2.0 pass each and every test contained in JCK 1.1a. Microsoft supports this contention by noting that its IE 3.0 product failed to pass several tests in the JCK 1.0.2 test suite and that Sun indicated that the failures were acceptable. Arun Decl. ¶¶ 4, 5. However, with respect to IE 3.0, Microsoft was required to fix its implementation of the JDK 1.0.2 to pass two tests of the fifteen that were reporting failures. *Id.* Accordingly, the course of dealing between Microsoft and Sun merely establishes that Microsoft's products must pass all the tests in the JCK test suite, unless Sun indicates otherwise. In the present case, Microsoft did not provide Sun with the opportunity to review the test suite results of IE 4.0 and SDKJ 2.0. Sun has also demonstrated a sufficient likelihood of establishing that 100% compliance with the Relevant Test Suite is required of Microsoft. *See* Hankinson Supp. Decl. ¶¶ 15, 16.

### c. RMI and JNI Class Libraries

Microsoft argues that Sun cannot properly test Microsoft's products for compliance with the RMI and JNI class libraries of the JAVA™ Technology.

With respect to the RMI class libraries, Sun and Microsoft appear to agree that Sun's RMI classes are "Supplemental Java Classes" governed by section 2.7 of the TLDA and that Microsoft has elected not to include the RMI classes in IE 4.0 and SDKJ 2.0. Accordingly, Microsoft has certain obligations to make the RMI classes available to the public. Sun and Microsoft disagree, however, as to whether Microsoft has failed to meet any of the public distribution requirements set forth in section 2.7(a) of the

TLDA. As to whether Microsoft has met its obligation under section 2.7(a), the court makes no finding, but does note that Microsoft must do so in order for its products to comply with the TLDA.

As to compatibility, the TLDA contemplates the inclusion of these Supplemental Java Classes in the tests of Microsoft's products. Microsoft's products are deemed to pass Sun's compatibility requirements if they pass when combined with the Supplemental Classes. *See* TLDA § 2.6(a)(vii). Sun contends that while Microsoft's IE 4.0 and SDKJ 2.0 products when combined with the RMI class files pass the RMI-specific compatibility tests, these products still fail Sun's "Signature Test." The court finds that Sun will probably prevail on this contention. *See* Schroer Supp. Decl. ¶¶ 23, 24, 25 & Exs. A, B (IE 4.0 and SDKJ 2.0, when combined with RMI class libraries, still generate Signature Test errors).

As to Sun's JNI class libraries, Microsoft argues that the TLDA does not permit Sun's testing for JNI compatibility. Microsoft argues that the TLDA limits Microsoft's compatibility requirements to the "bytecode specification." Microsoft argues that since the JNI classes are not part of the bytecode specification, any JNI testing is irrelevant. Sun, on the other hand, argues that native method interfaces (JNI classes) constitute part of the AAPI. More specifically, Sun contends that the JNI class libraries of the JDK 1.1 Upgrade represent an upgrade to the native method interface which existed in the prior JDK 1.0.2 release.

For purposes of Sun's motion for a preliminary injunction, Sun has raised a serious question as to whether its tests for JNI compliance are appropriate under the TLDA. The TLDA defines "Java Test Suite" as tests for evaluating whether Microsoft's products "comply with the SUN specification of the AAPI." TLDA § 1.15. AAPI or "Applet Application Programming Interface" includes "the public application programming interface to the Java Applet Environment (JAE) reflected in the Technology as defined in Exhibit A." TLDA § 1.1. Exhibit A attached to the TLDA reveals that the Java Applet Environment comprises certain Java Classes

and the "Java Runtime Interpreter, which implements the Java Virtual Machine." Sun also provides declarations from experts indicating that JNI is a public application programming interface to the Java Runtime Interpreter. *See* Deutsch Reply Decl. ¶ 12(c).

#### d. Conclusion

In summary, it appears that JCK 1.1a is the Relevant Test Suite under the TLDA. Furthermore, it appears that Microsoft's IE 4.0 and SDKJ 2.0 products both fail Sun's JCK 1.1a test suite in several material respects. Therefore, Sun has demonstrated a likelihood of establishing that Microsoft's use of the "JAVA Compatible" trademark is unauthorized.

#### 2. *Likelihood of Confusion*

Where a licensee persists in the unauthorized use of a licensor's trademark, courts have found that the continued use alone establishes a likelihood of consumer confusion. *See Paisa, Inc. v. N & G Auto, Inc.*, 928 F.Supp. 1009, 1012 n. 4 (C.D.Cal.1996); *S & R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 375 (3rd Cir.1992); *Hollywood Athletic Club v. GHAC–CityWalk*, 938 F.Supp. 612, 614–15 (C.D.Cal.1996) (citing *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38 (2d Cir. 1986) for the proposition that a licensor need only prove unauthorized use by its licensee to establish likelihood of confusion and irreparable harm).

■ In the present case, Sun has demonstrated a likelihood of success of establishing a likelihood of confusion caused by Microsoft's continued and unauthorized use of the "JAVA Compatible" trademark. According to Sun, the "JAVA Compatible" trademark signifies to consumers that any software product bearing the mark passes Sun's compatibility test suite. *See* Sun's Motion at 6. Microsoft argues that Sun's "JAVA Compatible" trademark cannot convey such a meaning since Sun permits its licensees to use the mark in inconsistent manners. Microsoft even argues that there can be no likelihood of confusion because consumers do not know exactly what the mark signifies. However, Microsoft's arguments do not address the fact that a licensee's use of the "JAVA Compatible" trademark also indicates Sun's approval of the product bearing the mark, regardless of whether the product passes all or nearly all of the tests in the JCK test suite. Here, Sun has not approved Microsoft's IE 4.0 and SDKJ 2.0 products. Therefore, Microsoft's use of the "JAVA Compatible" logo falsely implies that its software products implement the JAVA™ Technology in a manner approved by Sun.

#### D. IRREPARABLE HARM

■ When a plaintiff demonstrates a likelihood of confusion, it is generally presumed that the plaintiff will suffer irreparable injury if injunctive relief is not granted. *San Jose Mercury News*, 987 F.2d at 640; *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 n. 3 (9th Cir.1989). As persuasive authority indicates, the loss of control over one's mark at the hands of a licensee "is the very thing that constitutes irreparable harm in the licensing context." *Hollywood Athletic Club*, 938 F.Supp. at 615 (citations omitted). In the present case, Sun has demonstrated a sufficient likelihood of establishing consumer confusion entitling it to a presumption of irreparable harm.

### IV. ORDER

Since the court finds that Sun is likely to prevail on the merits and that it may suffer irreparable harm if Microsoft is not enjoined, a preliminary injunction is hereby issued against Microsoft, and its officers, agents, servants, employees, attorneys, and those in active concert or participation with them who receive actual notice of this order by personal service or otherwise, pending trial, from:

(1) Using, directly or indirectly, Sun's "JAVA Compatible" trademark or any other mark, logo, or identification that imitates, simulates, or is confusingly similar to said "JAVA Compatible" trademark on or in connection with the advertising, distribution, sale, or promotion of Microsoft's Software Developer's Kit for Java 2.0 (SDKJ 2.0) or Microsoft's Internet Explorer 4.0 (IE 4.0), unless and until each such product first passes the Sun test suite accompanying the most current version of the JAVA™ Technology incorporated in such product as passing is defined in the TLDA; and

(2) With regard to any SDKJ 2.0 or IE 4.0 product currently in the commercial distribu-

tion channel, Microsoft shall immediately undertake either to withdraw the product from the commercial sales channel or to remove or sufficiently sticker, obscure, or cover the "JAVA Compatible" mark which appears externally on the product packaging and in any point of purchase advertising, product manual, and collateral materials, and internally on any splash screens and icons. Microsoft shall also immediately remove the "JAVA Compatible" trademark from any Microsoft Web site where it appears in any location that refers to the IE 4.0 or SDKJ 2.0 product, and any location which has one or more links to one or more Web pages that refer to said products.

Microsoft shall have thirty (30) days from the date of this order to complete the foregoing and certify to this court that it has done so.

As a condition of this preliminary injunction, Sun shall give security within three (3) days of this order in the amount of $1,000,000 for the payment of such costs and damages as may be suffered by Microsoft if it is found to have been wrongfully enjoined.